IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| JASON HELMLINGER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 3:24cv083 |
| | ) |
| TOWN OF ASHLAND, VIRGINIA | ) |
| SERVE:   Mayor Steve Trivett | ) |
|          Town of Ashland | ) |
|          121 Thompson Street | ) |
|          Ashland, VA 23005 | ) |
| | ) |
| DOUGLAS A. GOODMAN, JR. | ) |
| SERVE:   Town of Ashland | ) |
|          121 Thompson Street | ) |
|          Ashland, VA 23005 | ) |
| | ) |
| and | ) |
| | ) |
| A. TROY ARONHALT | ) |
| SERVE:   Ashland Police Department | ) |
|          601 England Street | ) |
|          Ashland, VA 23005 | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff Jason Helmlinger, by counsel, states as follows for his Complaint against defendants Town of Ashland, Virginia, Douglas A. Goodman, Jr. and A. Troy Aronhalt.

### NATURE OF ACTION

1. This is an action for the violation of due process rights under the Fourteenth Amendment to the U.S. Constitution. For many years, Helmlinger was an excellent law enforcement officer with the Ashland Police Department ("APD"), ultimately working his way up to the rank of Investigator. Things changed, however, in February of 2022. At that time, Goodman, then the APD Chief of Police, and Aronhalt, then a Major with the

1

APD, falsely told the Hanover County Commonwealth's Attorney's Office that Helmlinger committed a "*Brady*"[1] issue (thus impugning his credibility as a law enforcement officer), falsely accused him of committing "integrity" violations while on the job at the APD, reported him to the Virginia Department of Criminal Justice Services ("DCJS") based on such false accusations, and forced him to resign. These false allegations and implications, individually and collectively, have placed a negative stigma on Helmlinger and caused him to suffer substantial harm.  As such, he now brings this lawsuit against the defendants to hold them liable for their wrongdoing.

**PARTIES**

2.   Helmlinger is an individual resident of Mechanicsville, Virginia.

3.   Defendant Goodman is the former APD Chief of Police.  He currently works for the Town in the position of Administrator Services Coordinator/Clerk of Council. At all relevant times herein, Goodman was acting under color of law. He is sued in his individual capacity.

4.   Defendant Aronhalt is the current APD Chief of Police and, for most of the relevant times discussed herein, was a Major in the Department.  At all relevant times herein, Aronhalt was acting under color of law.  He is sued in his individual capacity and in his official capacity.

5.   Defendant Town is the entity in charge of the APD and was Helmlinger's employer when he worked for the Department. The Town has authority to sue and be sued under Virginia law and is also a person within the contemplation of 42. U.S.C. § 1983.

---

[1] "*Brady*" refers to *Brady v. Maryland*, 373 U.S. 83 (1963), the case in which the Supreme Court established a constitutional obligation for prosecutors to produce exculpatory evidence to criminal defendants.

**JURISDICTION AND VENUE**

6. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

7. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claims occurred.

**FACTUAL BACKGROUND**

**A.   HELMLINGER WAS AN EXCELLENT OFFICER AT APD.**

8. At all times relevant herein up until February 9, 2022, Helmlinger worked for the APD. At the time of his separation from the Department, Helmlinger held the position of Investigator.

9. During his time with the Department, the APD repeated rated Helmlinger as an "Extraordinary Contributor" (the highest rating) in his performance evaluations. In those same documents, Helmlinger regularly received high praise for his work, including comments such as the following:

- "Outstanding protection for those who could not protect themselves."

- "You are one of the finest officers I have ever had the pleasure of working with. Keep up the fantastic work."

- "Helmlinger puts forth 110% effort into his investigations. He doesn't let any time pass before jumping on his cases. He exhausts all efforts and uses all resources necessary to solve his cases."

10. As well, during his time at the APD, Helmlinger received at least eight letters of commendation and awards. Included in these plaudits were (i) a Police Medal for work in the fall of 2020 – where he was praised for "confronting an armed individual in such a way that led to a successful conclusion with preservation of life" – and (ii) a recognition for providing training to new police cadets at the police academy.

**B.   THE ALLEGED FRAUD INCIDENT AND HELMLINGER'S PRE-EMPTIVE NARRATIVE ABOUT THE INCIDENT IN HIS POLICE REPORT.**

11.     Despite his success, Helmlinger made a paperwork error in November 2021. Specifically, as part of an investigation into an alleged fraud at a Wal-Mart, Helmlinger acted too hastily and filled out some of his paperwork in "pre-emptive" fashion – that is, he wrote statements in his report about certain events that he *expected to happen in his investigation* but that had not yet actually happened.

12.     The incident in question involved an 81-year-old man who claimed his debit card was fraudulently used at Wal-Mart in Ashland, Virginia. Specifically, he said that while at the store, he was approached by a homeless woman and her young daughter about buying certain items (e.g., blankets and medicine) for them. He agreed to do so and bought some things for them at one of the store's self-checkout registers. The victim said that he *did* authorize *one* purchase of more than $1,000.

13.     When he received his statement for his debit card, however, the victim saw a *second* charge at Wal-Mart for that same day for over $1,000. This second charge occurred very soon after the first charge. The victim believed he did *not* authorize the second charge and that, instead, the homeless woman, while her daughter was distracting him, made the second charge without his permission.

14.     Helmlinger investigated the incident. He first reviewed the elderly man's statement about the incident, especially where the man said he had not authorized a second purchase at Wal-Mart.

15.     Helmlinger then went to Wal-Mart and watched the store's camera footage of the incident. In doing so, he saw that the man had, in fact, swiped his debit card *twice* at the self-checkout register, and thus, the man had, in fact, authorized *two* charges.

16. After reviewing the video, Helmlinger concluded that, while it was likely that the homeless woman and her daughter took advantage of the older man, no crime had actually been committed.

17. Helmlinger then tried to contact the man to let him know what had actually happened at Wal-Mart. Helmlinger first went to what he thought was the victim's house.[2] He knocked on the door, but there was no answer. As such, Helmlinger left his business card on the door with a note asking the victim to call him.

18. Helmlinger then went back to what he thought was the victim's house later that same day. This time, a car was in the driveway, but again, no one answered the door. As such, Helmlinger called the victim's phone and left him a voice mail message. In the message, Helmlinger specifically told the victim that the incident in question did not appear to be a crime and that he [the victim] needed to call him back.

19. At this point, Helmlinger returned to APD headquarters and began working on paperwork. At that particular time, Helmlinger had approximately 23-26 cases assigned to him, and he was focused on completing those cases.

20. In working on his paperwork, however, Helmlinger acted in haste with respect to the elderly man's fraud complaint. Specifically, since he believed that no crime had been committed and because he fully anticipated that the victim would return his call later that same day (at which time he planned to return to the victim's residence and explain what actually happened with the two charges), Helmlinger supplemented his report as follows:

> Investigator Helmlinger met with [the victim] at his residence to discuss the incident in question. [The victim] agreed that he swiped his card twice but was not aware that the final price

---

[2] Unbeknownst to Helmlinger, the patrolman who had initially taken the complaint from the elderly man wrote down the *wrong* address for the victim. As such, Helmlinger went to the wrong house – not once, but twice – through no fault of his own.

5

> amount would be that much. He felt like the subject in question added a few more things in than he agreed to buy. It was not until he received his credit card statement that he became aware of the amount. Investigator Helmlinger explained to [the victim] a crime had not been committed because he willingly swiped his cred card for that amount. [The victim] felt like he had been taken advantage of but understood that a crime had not been committed.

Helmlinger fully expected these words to be accurate by the end of the day.

21. Helmlinger then closed the case – again fully expecting that his words would be true by the end of the day when the victim returned his call.

22. The victim, however, never returned Helmlinger's call.

23. Thereafter, Helmlinger got focused on other cases and completely forgot that he had written the pre-emptive narrative on his report about the alleged fraud.

24. Helmlinger should not have done what he did. That is, Helmlinger should not have written the pre-emptive narrative part on his police report, and he should not have closed the case without speaking to the victim.

C. THE VICTIM COMPLAINS AND THE APD PURPORTS TO INVESTIGATE HELMLINGER.

25. At the time he closed the case involving the elderly victim, Helmlinger did not realize he was making a mistake.

26. Weeks later, however, Helmlinger learned of his error.

27. On January 26, 2022, the victim came into the APD headquarters and asked to see a copy of the report involving his complaint. When he saw the report -- especially Helmlinger's incorrect factual summary -- the victim immediately complained to Goodman and others and said the report was inaccurate. He was particularly upset that his fraud claim had been deemed "unfounded," because that meant that he would not be reimbursed for his alleged losses.

28. Five days later, Goodman called Helmlinger into APD headquarters and told him about the complaint. Helmlinger attempted to explain the situation and even offered to go back to the victim's house to try to rectify the situation.

29. Goodman, however, refused and, instead, demanded Helmlinger's badge and gun. He told Helmlinger to do an in-person interview with Aronhalt so that he [Helmlinger] could explain his conduct, and then he left.

30. Helmlinger did so. As part thereof, Helmlinger (i) candidly explained how he had pre-emptively written in his report about what he *expected to happen* in terms of his follow-up with the elderly man; (ii) admitted that the follow-up never occurred; and (iii) admitted that his report was not accurate. Helmlinger also made clear that he had no intent to be deceitful or dishonest.

31. Even so, when the interview ended, Goodman returned and told Helmlinger he "did not see how" he "could continue his employment" with the APD. He then relieved Helmlinger of duty, told him he was suspended, and had him escorted home by an APD Sergeant.

32. During his suspension, Helmlinger was informed by a fellow APD officer that Goodman told to him "I will accept Jason's resignation if he gives it to me." The not-so-subtle hint from this third-party message was that Helmlinger was going to be terminated unless he resigned first.

33. A few days later, on February 2, 2022, Aronhalt asked Helmlinger to come into headquarters for a second time to do another interview. Helmlinger agreed to do so and met with Aronhalt at approximately 2:00 p.m. on that date.

34. As he had done in his first interview, Helmlinger again accepted responsibility for the report and again made clear he was not in any way acting deceptively or dishonestly

7

when he pre-emptively completed his report.  As he explained: "It was not intent to receive. . . . I'm gaining nothing from this. . . . I cut a corner, I admitted that.  I should not have cut a corner . . . but I had no intent to deceive anybody."

35. Then, at the end of the interview, Aronhalt looked at Helmlinger and said "*Do you have anything for the chief?*," a hint that Helmlinger should now submit his resignation. Helmlinger did not immediately understand this cue and asked Aronhalt for clarification. Aronhalt again stated: "*Anything at all for the chief?*" – again hinting to Helmlinger that he should submit his resignation. At this point, Helmlinger got the hint and tendered a written resignation letter, to be effective immediately.

36. Aronhalt then took Helmlinger to see Goodman, who reviewed the letter, said he would accept Helmlinger's resignation, and asked him to stay employed with the APD through February 9, 2022 so that he could do a debriefing on his active cases.  Helmlinger agreed to stay this extra time.

D. **GOODMAN FALSELY ACCUSES HELMLINGER *TWICE* OF COMMITTING ACTS THAT IMPLICATE "BRADY" BUT FAILS TO PROVIDE HIM ANY DUE PROCESS PRIOR TO MAKING THESE FALSE ALLEGATIONS.**

37. Over the course of the next six days, Helmlinger kept his commitment to Goodman and assisted the APD in reviewing his current cases.

38. During this same time period, however, Goodman told the Hanover County Commonwealth's Attorney that Helmlinger's act of creating a pre-emptive police report constituted a "Brady" issue – that is, that it was material that could be used to impeach and attack Helmlinger's credibility as a witness in future trial testimony.

39. Goodman did not give Helmlinger any advance notice or warning about his decision to communicate with the Hanover County Commonwealth's Attorney's Office about this potential "Brady" issue.

8

40. Instead, by letter dated February 7, 2022, Goodman told Shari Skipper, a Deputy Commonwealth's Attorney with the Hanover County Commonwealth's Attorney's Office that Helmlinger's actions constituted *Brady* material and thus, such actions would have to be disclosed to defense attorneys pre-trial as alleged exculpatory material. In relevant part, he wrote:

> The purpose of this correspondence is to notify you of **_what we believe_** to be a "Brady" issue.
>
> The Ashland Police Department recently initiated an internal affairs into an allegation of a discrepancy in a police report brought to use by a citizen. Our investigation thus far has determined that a statement made in an investigation report by Inv. Jason Helmlinger was **_not factual and included the misrepresentation of a victim statement that led to him "unfounding" the case_**.
>
> Attached to this letter is a summary of our internal investigation to date. Investigator Helmlinger has been relieved of duty and remains suspended.
>
> I understand the seriousness of this situation and my agency stands at the ready to assist you and your staff in whatever steps need to be taken to ensure our compliance with "Brady" requirement and the **_overall integrity_** of the Ashland Police Department. . . . .

*See* February 7, 2022 Letter attached as **Exhibit A**.

41. In short, Goodman (i) attacked Helmlinger's character as a law enforcement officer, (ii) attacked it in direct connection to the fact that Helmlinger had been relieved of duty and suspended; and (iii) did not give Helmlinger an opportunity to disagree with, or otherwise refute the attack.

42. Worse, Goodman's attack was false and wrong. In a published decision issued almost three full years **_before_** Goodman made his "Brady" accusations against Helmlinger, the Court of Appeals of Virginia held that a law enforcement officer's prior one-time false

9

statement in a police report does **_not_** qualify as "Brady" material because it is neither exculpatory nor able to be used for impeachment against the officer.

43. The case is *Castillo v. Commonwealth*, 827 S.E.2d 790 (Va. Ct. App. 2019); it is on point; and Goodman is charged with knowing about its holding as part of his duties as the head law enforcement officer of the APD. The law on this issue was clear and settled by at least mid-2019, but Goodman did not act in accordance with it.

44. Goodman made additional false statements about Helmlinger on February 10, 2022 when he submitted his DC-1 report about Helmlinger to DCJS. Specifically, on the DC-1 form, Goodman falsely stated that (i) Helmlinger had violated APD Standards of Conduct for truthfulness; (i) Helmlinger committed acts that compromised his "credibility, integrity, and honesty"; **_and_** (iii) Helmlinger committed acts "that constitute exculpatory or impeachment evident [sic] in a criminal case." The latter of the two above-quoted statements is a direct reference to the legal standard used by courts to analyze whether something is covered by *Brady*.

45. A copy of the DC-1 form is attached hereto as **Exhibit B**. It was signed by Goodman and upon information and belief, was completed and drafted by both Goodman and Aronhalt.

46. At no time prior to submitting the DC-1 form did either Goodman or Aronhalt show the form to Helmlinger or ask for his input about its contents.

47. As with Goodman's February 7, 2022 letter to Skipper, the DC-1 form was both false and wrong. Indeed, as before, the accusations in the DC-1 form are directly at odds with the rule of law established in *Castillo v. Commonwealth*, 827 S.E.2d 790 (Va. Ct. App. 2019). Simply put, Helmlinger's actions – as a matter of law – did not constitute acts which implicated *Brady*.

48. As a final falsity, The DC-1 form falsely shaded the narrative section against Helmlinger (conspicuously omitting Helmlinger's explanations about what had happened) and thus falsely lead the reader to conclude that Helmlinger had resigned because he got caught engaging in misconduct.

E. *AFTER* HE HAD ALREADY REPORTED HELMLINGER TO THE HANOVER COUNTY CA'S OFFICE <u>AND</u> DCJS FOR "BRADY" ISSUES, GOODMAN COMMISSIONED AN AUDIT OF HELMLINGER'S CASES WHICH CONCLUDED THAT THERE WERE "NO ISSUES OR CONCERNS" ABOUT THEM.

49. More than a week *after* Helmlinger's resignation from the APD, Goodman directed an audit of Helmlinger's cases. The audit, which was carried out by Captain Mary Kemp and Anthony Callahan, concluded that there were "[n]o issues or concerns" about any of Helmlinger's other cases.

50. Notwithstanding the audit, at no time did Goodman – or anyone else at APD – rescind the February 7, 2022 "Brady"-issue letter to Skipper or inform that DCJS that the alleged misconduct regarding Helmlinger only involved one single incident of an alleged false report and not any kind of pattern of misconduct.

51. To the contrary, in October 2022, long *after* the APD had confirmed that there were no problems with Helmlinger's other cases, the false accusations against Helmlinger appeared to resurface. Specifically, as Helmlinger was testifying for the Commonwealth in a criminal matter, the defense attorney suddenly admonished him "**I just want you to be truthful**" even though, contextually, there was absolutely no reason for anyone to think that Helmlinger was saying something *un*truthful. Upon information and belief, the defense attorney had been advised that Helmlinger had a "Brady" issue and with his question, was exploring whether or not he needed to raise the issue with the Court.

52.

11

**F.** **WHEN HELMLINGER *FINALLY* GOT PROPER DUE PROCESS AS TO GOODMAN'S FALSE ALLEGATIONS AGAINST HIM, HE WAS ABLE PREVAIL AT THE DCJS AND HIS DE-CERTIFICATION WAS REVERSED.**

53. When Goodman/the APD submitted the DC-1 form to the DCJS, Helmlinger was automatically de-certified as a law enforcement officer. In other words, unless and until such de-certification was reversed, he was unable to obtain any employment as a law enforcement officer in Virginia.

54. Helmlinger timely appealed Goodman's actions, appeared *twice* before the DCJS, and had his de-certification reversed in October of 2022. As part of his presentation to the DCJS, Helmlinger, through counsel, emphasized the importance of the *Castillo* case and emphasized that his conduct did not qualify – and could never have qualified -- as a "Brady" issue.

55. The DCJS agreed. Even more, many of its members took note of the fact that Helmlinger had nothing to gain from writing his "pre-emptive" narrative section of the report at issue and no reason to lie about the matter.

56. The key to Helmlinger's success in rebutting the false allegations against him was due process. At the DCJS, Helmlinger had proper notice of the allegations against him, was able to review the allegedly supporting documentation compiled by the APD, was able to review and rely upon the relevant law, and ultimately was able to prove that the allegations against him did not constitute a "Brady" issue. Indeed, if Goodman and/or the APD had properly provided Helmlinger with due process, Goodman never would have sent his February 7, 2022 letter to Skinner nor sent the DC-1 form to DCJS.

**G.** **AFTERMATH.**

57. As a result of Defendants' false public statements about Helmlinger, he has suffered substantial damages.

## COUNT I:
### DUE PROCESS VIOLATION: LIBERTY INTEREST
### (AGAINST GOODMAN, ARONHALT, AND THE TOWN)

58. The allegations of paragraphs 1-56 are realleged as if fully set forth herein.

59. Under the Fourteenth Amendment, Helmlinger has a liberty interest to engage in the commonplace occupations of his life and with respect to his good name, reputation, honor, and integrity.

60. Here, Goodman, Aronhalt, and APD violated Helmlinger's liberty interests by falsely stating (in paragraphs 44-45 and 47-48 of the Complaint and **Exhibit B**), in conjunction with Helmlinger's forced resignation, that Helmlinger had engaged in acts of misconduct that undermined his credibility, integrity, and honesty as a law enforcement officer and constituted exculpatory or impeachment conduct under *Brady* and that he had resigned because he got caught committing such acts.

61. These false accusations impugn Helmlinger's good name, honor, reputation, and integrity, thus causing a stigma to his reputation, and were made in connection with his forced resignation from employment at the APD.

62. Additionally, the false statements at issue were made public to, among others, the DCJS.

63. As a direct result of the actions of the defendants named in this Count, in violation of the rights secured to him under 42 U.S.C. § 1983 ("Section 1983"), Helmlinger has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Helmlinger has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

64. Further, Goodman's actions are attributable to the Town because his statements were made in his capacity of a de facto policy-maker at the APD and also as the result of a de facto policy by him to *overreport* alleged misconduct at the APD without fully appreciating the consequences of such overreporting and engaging in such overreporting *prior* to conducting a full investigation into the accuracy or validity of the allegations therein.

65. Further, Goodman's and Aronhalt's actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Helmlinger's rights, thus entitling him to punitive damages.

66. Finally, Helmlinger was not given proper due process as to the false allegations against him, and further, the negative public comments at issue in this Count irreparably poisoned the perception about Helmlinger to such a degree that any type of name-clearing hearing or post-deprivation remedy would have been futile or worthless.

### COUNT II:
### DUE PROCESS VIOLATION: LIBERTY INTEREST
### (AGAINST GOODMAN AND THE TOWN)

67. The allegations of paragraphs 1-65 are realleged as if fully set forth herein.

68. Under the Fourteenth Amendment, Helmlinger has a liberty interest to engage in the commonplace occupations of his life and with respect to his good name, reputation, honor, and integrity.

69. Here, Goodman, for himself and for the Town, violated liberty interests by falsely indicating (in paragraphs 40-41 of the Complaint and **Exhibit A**), in conjunction with his suspension, removal from duty and later forced resignation, that Helmlinger had engaged in acts that constituted exculpatory or impeachment conduct under *Brady*.

70. These false accusations impugn Helmlinger's good name, honor, reputation, and integrity, thus causing a stigma to his reputation, and were made in connection with his suspension, removal from duty, and later, forced resignation of employment from the APD.

71. Additionally, the false statements at issue were made public to, among others, the Hanover County Commonwealth's Attorney's Office.

72. Further, Goodman's actions are attributable to the Town because his statements were made in his capacity of a de facto policy-maker at the APD and also as the result of a de facto policy by him to *overreport* alleged misconduct at the APD without fully appreciating the consequences of such overreporting and to engage in such overreports *prior* to conducting a full investigation into the accuracy or validity of the allegations therein.

73. As a direct result of the actions of the defendants named in this Count, in violation of the rights secured to him under Section 1983, Helmlinger has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Helmlinger has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

74. Further, Goodman's actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Helmlinger"s rights, thus entitling him to punitive damages.

75. Finally, Helmlinger was not given *any* due process prior to Goodman's false allegations against him, and, in any event, Goodman's negative comments irreparably

poisoned public perception about Helmlinger to such a degree that any type of name-clearing hearing or post-deprivation remedy would have been futile or worthless.

WHEREFORE, Plaintiff requests this Honorable Court to:

a. Accept jurisdiction of this case;

b. Award Plaintiff compensatory damages against Defendants for the humiliation, mental and emotional distress, and pain and suffering that he has experienced and endured as a result of the unlawful actions of Defendants towards him, as well as damages for all recoverable lost and future wages. Such damages shall be in an amount not to exceed ONE MILLION DOLLARS ($1,000,000.00), the exact amount to be determined at trial;

c. Award Plaintiff punitive damages against Goodman and Aronhalt in an amount not to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), the exact amount to be determined at trial;

d. Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

e. Attorney's fees;

f. Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED**.

                JASON HELMLINGER

                By:    s/ Richard F. Hawkins, III
                        Virginia Bar Number: 40666
                        THE HAWKINS LAW FIRM, PC
                        2222 Monument Avenue
                        Richmond, Virginia 23220
                        (804) 308-3040 (telephone)
                        (804) 308-3132 (facsimile)

Email: rhawkins@thehawkinslawfirmpc.com

Counsel for Plaintiff